Page number 20-1411 et al. Everport Terminal Services Inc petitioner versus National Labor Relations Board. Mr. Parrish for the petitioner Everport Terminal Services Inc, Ms. Malleo for the petitioner International Longshore and Warehouse Union, Mr. Sautter for the respondents, Mr. Rosenfeld for the interviewers. Good morning, counsel. Mr. Parrish, please proceed when you're ready. Good morning. Thank you, your honors. May it please the court, Ashley Parrish for Everport. This case involves a dispute over which union Everport should have negotiated with for the maintenance and repair work at the terminal it operates in Oakland, either the longshoremen, the ILW, or the machinists, IAM. Everport's position is straightforward. Because the board has designated the longshoremen as the coastwide unit, we were required to agree to the longshore contract, which required in turn Everport to use the longshoremen for this work. As your honors may have noticed, there's a disconnect in the briefing. The board never meaningfully engages with our basic argument as to why we are obliged to work with the longshoremen. And there's a reason for that. The board is using this enforcement case, it appears, to try to change the rules that it has put in place and that have governed the work on the ports for decades. This morning, I'd like to focus on three points. First, I'll explain- Longshoremen did not historically have representation rights in this group. That came years after it started. So that is kind of a fabricated assertion on your side of the case. I'm not saying you're fabricating, but that is not a correct assertion. That came after a long period of time. The point- I'm most interested in hearing what you have to say. What the board is doing is saying that whatever you think your contractual arguments are, they don't trump the successor rule. The board has a legal rule they're relying on. They say the successor rule applies, and that's that. And they do not agree with you to the extent that you're arguing it, that there was any accretion upon which you could rely. Those are legal determinations, and I don't know why we don't defer to them. They say the successor rule applies, and you can't argue that your notion of the contract trumps that. Your Honor, let me take that in terms. First, let me be clear. We're not arguing accretion. What we are arguing, though, is that the board has set up a process where, as the employer, we have only one choice. If we want to operate a terminal, we must have longshoremen. Those are the folks that take the cargo off of its container. So we have to enter into a contract with the longshoremen. The only way to do that under the history – and this is a long history, Judge Edwards – But it doesn't start from the very beginning. Your Honor, it may not, but – In the context of this case, that's not insignificant because you're suggesting something that is inaccurate. It hasn't always been this way. The machinists have been around, and the machinists were properly around before this change, and they had bargaining rights. So, I mean, you're making an inconsistent argument. You're saying there's no conceivable way the machinists can be here in this area because the longshoremen always – Well, that's not true. The machinists were here properly, and there was no claim that the longshoremen could have come out and moved them out when they were there before these changes were made. And what the board said was, under the successor doctrine, the machinists – the employer is required to recognize the machinists, not the longshoremen. So, Your Honor, with respect, I understand your question, and I understand how you framed it, and I agree with how you're framing it, but I disagree with your premise, and I'm not debating with you that the machinists have been here for a long time. What I'm saying is for the stevedore work, not the repair and maintenance – let's put that aside – for the stevedore work, which any terminal operator needs to use, there is only one bargaining unit that's been deemed appropriate by the board. That is the longshoremen, and that has been true for a long time. Now, Your Honor, I agree with you. There has been a long-running dispute between the two unions as to which union is responsible for the maintenance work, and the longshoremen will tell you that for a long time, this type of maintenance and repair work is something they've been responsible for. But, Your Honor, I don't need to win that argument. What I need to tell you is that the board has set up a system that if I want to operate the port, I have to go to the longshore for the stevedore work. And because the board has designated them as the appropriate union, there is now the longshore contract. Now, the board does not dispute that we needed to enter the longshore contract with them, nor does it dispute that the Ninth Circuit decision from just last year says that under that agreement, it's unambiguous that this maintenance and repair, or maintenance and repair work in general, must be assigned to the longshoremen. And so the problem, Judge Edwards, is we are in the middle. I'm sorry, Judge Rao. Mr. Parrish, my question, I guess, is a factual one. I mean, could Everport have hired longshoremen without joining the PMA? Would it have access to longshoremen without joining the PMA? Judge Rao, my understanding is no, and for two reasons. One is that as a matter of longstanding principle, it has been a multi-employer bargaining unit, which is the Pacific Maritime Association, the PMA, and that we could not individually bargain with the longshore union. And two, because the longshore union has this collective multi-employer, the only way we could do that is to join the longshore contract with them. So you're saying that's true as a matter of law, not just as a practical matter, because that's what I wasn't clear from the briefing. I mean, it sounds like practically speaking, that's true, but I'm wondering if that's also formally true as a matter of contract. It is both. I'm sorry, let me say both with the exception of the last bit that you said, which is that the reason it is legally true is because the board has decided that the longshoremen are the coast wide bargaining unit and because of the existence of the PMA. But that's a different question though. So they may be the coast wide bargaining unit, but does that mean that you have to join the PMA in order to bargain with them? Under the way it's been set up, yes, by the board. And your honor, this is not something, our main point here is that the board is free to change the rules. Now, there's good reasons why the board wouldn't do that. But the board is free to change the rules anytime it wants, prospectively. And if you take a look at, say, for example, the 1981 PMA decision, the board has looked at these specific contractual provisions and it says they're fine. It has enforced them. It's even held as an unfair labor practice against the IAM for not complying with these provisions and trying to get work, maintenance and service work that was assigned to the ILW. I guess my question in part arises from the fact that it seems like there are these, there's this, I mean, as you mentioned earlier, the board and your arguments and the board's arguments are talking past each other to some large degree. And the board is talking about successorship and you are talking about your obligations under the contract. And so I guess my questions are really running to, did you have to enter into this contract? I mean, it seems like some of the board's arguments are you didn't have to join the PMA in order to run your business, but it sounds like what you're saying is you did have to join the PMA. Your Honor, I am saying that I am also saying that the board has never questioned the lawfulness of joining the PMA. It doesn't dispute, in fact, it concedes that the longshore contract is controlling. And in the test that they apply under the burdens test, it's a question of what is the appropriate bargaining unit, which unit. And that's answered by the system that the board has put in place. The PMA doesn't conclusively determine as a matter of law that with respect to disputed work and an appropriate bargaining unit, it goes to the longshoreman because in this same unit before this dispute, the machinists represented the employees in the appropriate unit. I mean, that's the piece that makes no sense to your argument. This is the same unit. It was red marked or whatever you call it. It was understood by everyone that the machinists are the representative in this piece. OK, let's it's just like a little lump in this whole coast. There is this piece and this piece is represented by the machinists. No one ever assumed that the PMA said otherwise. No one. So all you had the intervene. The facts that now come up is the employer said, OK, we're going to close it down for a minute. OK, we're opening up for a minute and now we're going to continue. And the board said, yeah, you're right in the successor area. And the law is the machinists continue to represent period. Your honor, you put your finger right on it. And that's a problem, which is that under the longshore contract, there is a red circle requirement, which is why the machinists were at that time appropriate union under the interpretation of that contract by both PMA and by the longshoreman. The board does not dispute this in the first of that interpretation. We are no longer red circled because Everport took over the operations and did not have a preexisting relationship with the machinists of success. But the problem is, there is a fiction that we accept there that when you have a successor, they did previously represent your. You're running up against you're trying to say our contract trumps the legal requirement and you're trying you're trying to say your contract is the legal requirement. That's not correct here because the successor rule is a rule. There is a fiction that assumes that the employer is still there. That's what the successor rule assumes your honor. I completely agree with you that that's the successor rule. The successor rule says you must identify the appropriate bargaining units. The board has set up the system that the appropriate bargaining unit for Steve Adore longshoreman work is the longshoreman. It's a coast wide unit. The board has allowed them to have a collective bargaining agreement with PMA that governs all the ports up inside the coast. And as the Ninth Circuit decision makes clear that agreement says that all new maintenance work that's not red circle has to go to them. Are you saying that the work that's being done in this area, Evergreen, Seaside, Marine is different than what was previously being done? Your honor, I'm saying that under the long term. No, no, no, no, no. Answer my question. Is the work different? Your honor, most largely no. If you look at the record. Okay, so, okay, that's what I thought. So, different employer names, but the work's the same, right? Correct, your honor. Okay, so forget your contract because quite frankly, that's your biggest problem. The contract doesn't trump the law. So, the work's being done. No one, not the board, not the longshoreman, no one assumed that the unit as constructed before this change was improperly assigned to a union that did not have bargaining rights. They had majority of bargaining rights that were not impermissible under the law. There was a moment when they closed that and then they reopened and under the established law, the board said they didn't really close. It's a successor. That's your problem. Your view of what the contract, the PMA may or may not say is not correct because the successor rule trumps you out. With respect, no, your honor. And the reason is, is because the board gets to choose which is the appropriate union. They did. In applying the successor rule, they are, but they are making a determination as to the appropriate unit. That's exactly what the successor rule is. But your honor, the successor rule says what's the appropriate union. You then have to look at what the appropriate union is. What you're saying is the default is, the default in any other situation would be that it would be the existing unit. The problem is, is that in the coast, on the West Coast, we were in a situation where it was lawful for us to join the PMA. And under the terms of the longshore contract that the board has essentially approved, that work has to be assigned. And the appropriate unit is now the longshoreman. The is now is your problem because there's nothing that's changed. Your honor, the problem I have is that as the employer, there is nothing I can do. If you were to agree with the other side, then I would have an unfair labor practice against me for not complying with the contract because the board would say. Oh, you know what? I take good odds on your side that you'd win that one hands down. If you had an opinion from this court that said the successor rule trumps and that they are bargaining with the appropriate union in an appropriate bargaining. I don't think you may have other problems. I'm no fool. I understand when you got two unions fighting over this kind of work, you might run into other problems. And as the employer, you don't want the aggravation. That isn't the question. Your honor, the problem is, is that that's all perspective looking at the board wants to set up that system. It can easily say, look, the coast wide bargaining unit will not be the longshoreman. It can easily say that the longshore provisions in the contract that we're going around in circles because the board is already set. But your piece belongs to the machine. They already said that. And you're saying, but wait, it's not there anymore. And the board said, sure, it is because of the successor rule. Your honor, the Ninth Circuit yet last year in the decision, we cite the Kinder Morgan decision, rejects the board's position and says this piece does not belong to the machinist. It belongs to the longshoreman. So can I ask the following question, which is you have one set of arguments that you think you need in order to win at the end of the day. I'm more interested in what we should do with the case that we have right now. And it seems to me that the way Judge Edwards understands the relationship between the successor rule and what you're thinking is your contractual obligations. That may be the state of the law. And if the board announces that that's the state of the law, well, then you've got something that you need to contend with, because it's conceivable as a matter of law that the successor rule Trump's contract that could happen. You may think that that doesn't make any sense. And that puts you in a bad position. And that's unworkable. And then that's just something that the board's going to have to contend with. My question is, even if that's where the law ends up, does the decision that we're reviewing do the work? Because one other way to look at it is that maybe the board reaches that conclusion at the end of the day, but we just can't tell from the ALJ opinion that was ratified by the board that it engaged on these issues. And unless and until we see that the board is engaged with it and thinks that even in the contractual scenario that you outlined, the board's decision can't be affirmed on that basis. And, for example, one question, you need to win on the red circle exception not carrying forward, even under your theory of the case. And right now we assume – I know that you assume that, and you say that the board doesn't contradict that assumption, and I take your point on that. But at the end of the day, for you to prevail, that would need to be true. And one question I have is an intermediate way to look at the case is, regardless of whether you're right or the competing way of looking at it is right, which is that the successor rule just carries the day over and above the contractual obligations that you say you have, that we just can't discern that conclusion from the board's reasoning at this point. And so it at least needs to go back to the board for the board to wrestle with this. Your Honor, I completely agree with that. And I think that under the Ports American case, this court decided in 2020, the board's failure to engage is a reason to remand. The challenge we have, Your Honor, is that you will see that if this was a question as to what the right policy should be going forward, we would completely agree with you that there's no more role. The problem that we have is not that we're asking whether the contract trumps the board's rules. What we're asking the court to find is that the board's rules trump the board's new rule. And the problem is that we're put in this position where in an enforcement context, the board has never, and in fact, on its brief on appeal, appears to concede the logical steps in our argument. So the reason why I agree with you, Your Honor, that at a minimum you need to send it back is they haven't engaged. But if you look at the concessions they've made and the decisions they've made in the past as to how they've set up the bargaining unit, this is not an enforcement case. This is a question of the board changing its policy, which it's free to do going forward, but not retroactively. Well, even as to that, I mean, that might be an argument that you have in your back pocket no matter what. But for us, at least from where I sit, it's a little bit difficult to understand how all these things interrelate until I see an analysis and an explanation that elucidates the board's perspective on how they do. Your Honor, I mean, it's a fair point. There's no doubt that the board has not engaged. It doesn't even engage in its brief before the court. So I understand why the court feels at sea in terms of addressing the issue. Mr. Parrish, I guess following up on Judge Srinivasan's point, I mean, do you think that there's an argument that is a matter of law? The contract needs to trump the successorship rule? Or do you agree with Judge Srinivasan that on remand the board is free to decide either direction? Thank you, Your Honor. I don't agree that the board is free to decide either direction on remand. And the reason is, is because it's not that the contract per se trumps. It's the fact that the board has made the decision that the Coastwide Bargaining Unit is the longshoreman. And once it did that, the longshoreman... When do you think they did that? The history doesn't support that. The machinists have been around. I mean, we're just going in circles. Machinists have been around before. They have been around in this particular area, which is coastwide. Your Honor, I'm sorry. You think I'm disputing that with you, and I'm not. What I'm disputing with you is that for the Stevedore work, for the Stevedore work itself, that's something the machinists have never done. That's only the longshoreman. I asked you well into the argument, is the work being done in this area, which is not new, it's just new employers, the same work? And you said yes. It's the same work that was done before. And then I said, and the machinists were the representatives, right? And you said yes. So your argument's not making sense, and my colleague may be right. It may be that we're just going to keep going in circles, and maybe the board has to clarify what they're talking about. But your claim that this is somehow new doesn't make sense on the record of this case. It's not new. So, Your Honor, the problem is that I'm not being clear enough to you because I'm not going in circles. I understand what you're saying, and I'm trying to respond. What I'm saying is that there is a – first, we know that the Stevedore work has always been the longshoreman. We all agree with that. The process of the courts have changed. There has been a longstanding dispute as to what to do with the work that could be done by either the machinists or the longshoremen. That is in the record. You can see it in all the board's decisions. These decisions come up all the time. Then what has happened is that since 1978 and through the 1980s, there has been the longshore contract, which the Ninth Circuit last year ruled contrary to the board, unambiguously assigned repair and machine work to the longshoremen. And so, Judge Edwards, what I'm trying to say, and Judge Rao, what I'm answering to your question is that because the board has set up a system where they've given for the Stevedore, the longshore work, to the longshoremen, and the longshoremen have then negotiated a longstanding collective bargaining agreement that covers more than just that, Judge Edwards, that goes into the work that the machinists also do. But the board has looked at that many times, and it has many times said that those provisions are appropriate. And then last year in the Ninth Circuit, it was clear that the Ninth Circuit said that unambiguously includes this type of work. And so, Judge Rao, the answer is when you put those two things together, there's only one result, which is that the board would have to reach the conclusion on remand that there's a legal requirement that we did what we were supposed to do, and the board would have to change it going forward. So, just so I understand, so your argument is that if they wanted to change it going forward, they would have to engage in rulemaking, that they can't do this through an enforcement action? I'm sorry, Your Honor. Yes. So, there's a couple of provisions. They could do it under Section 9 of the Act and Section 10. One is a complaint against the union, so there could be a complaint relating to the contract itself, and then the board could look at that and say, we don't think those contract provisions. So, it could address Judge Edwards' questions and say, look, we think this work really belongs to the machinists, not to Longshoremen. We don't think the Ninth Circuit was correct about this, or in any event, we think that the provisions are improper, and it could change the agreement if it wanted to. And then under 9, it has the ability to certify an appropriate bargaining unit. It could if it wanted to open all this up, and I'm not suggesting it would want to because there's a lot of history here. But the reason why it selected the Longshoremen as the coast-wide bargaining unit for the Longshore-Sevador work a long time ago has some reasons, but it could open that up and could change that if it wanted to. And so, absent those actions, your position is that making that decision in your enforcement action would be impermissibly retroactive. Right. What we did was the natural consequence of the system that the board has set up, and the problem is that the board's arguments about successorship don't address the threshold question, which is what is the appropriate union. We have this threshold argument that says in figuring out the appropriate union unit, you have to look at what the board set up with the system it's done in terms of having this coast-wide unit. Was the prior unit appropriate? Yes, Your Honor, because— Okay. Well, let me ask you a problem. You know what I'm going to now ask. If the prior unit was appropriate, under all of your analysis, contract, legal, and everything else, if the prior unit was appropriate, what you're looking at is a situation where the board is essentially saying the prior unit still exists. Sorry, Your Honor. The prior unit was appropriate until Everport took over the port. But that's—we're going in circles. How does the successor rule come in? No, no, Your Honor, no. So what I'm saying, Your Honor, is that in terms of asking the appropriateness question, before you get to the successor rule, what you would say is you would say that we're bound by the collectively bargained agreement, and under that, it has rules for red circling as to when a unit that was previously appropriate remains appropriate. And the distinction there, which the board does not dispute, is whether there was a pre-existing relationship. If Everport had had a pre-existing relationship, then under those circumstances, the machinists would have been appropriate and would have remained appropriate, and we would have had to, under the longshore contract, continue working with them, which is why they remain there, because under the seaside and the two organizations that work for seaside, there were that pre-existing relationship, which is why the machinists continued under the longshore contract. Typically, if we vacate an agency determination on arbitrary and capricious grounds because it hasn't wrestled with some of the arguments that you're putting forward now, it goes back and the agency can do it again, and the agency is free to reach the same result. It just has to come up with a reasoning that's non-arbitrary and capricious in order to sustain the result, and then that's judicially reviewed, and then the court that reviews that determines whether the new determination survives scrutiny. So, Judge Green and Gossin, let me see if I can be really clear, because I think I understand you exactly. If we think that if you piece together what the board has said before and what it doesn't dispute here, there is, to answer Judge Rouse's question, there's only one legally permissible determination here. But I agree with you that if you don't agree with that, and if you agree with that, it would save everyone a lot of trouble from going back and forth. But if you don't agree with that in the sense that you can't piece it together, then obviously you can remand and we can be back before the court on the same issue. Right. You can make the same argument before the board to tell the board on remand, actually, you don't have any discretion in this based on the Ninth Circuit decision and the other understandings. You can only go one way unless you're only going to do it prospectively, and then we'll have to see what the board says about that, and then a court that's reviewing that determination can make an assessment. You're right, Your Honor. The only thing I'd say is we've said it and the board's conceded all of the central things. And the reason why it isn't engaging is because it has no answer, because there is no answer, because all it says is Judge Edwards, which is your analysis, which is, oh, successorship. But the problem is, is that there's a step before that which says what's the appropriate unit. The board has put that in place and the board doesn't dispute any of the threshold. He agrees with us that it was fine for us to join the TMA. It agrees with us in its brief that the longshore contract is governing. And once it's made those two concessions and it agrees that the longshoremen are the appropriate unit, once it's made those three concessions, there's nowhere else for the board to go. Well, unless the board thinks that the way the successor rule operates is that when you have a phenomenon like the Red Circle exception, that just essentially, the successor rule just essentially makes that permanent. Except for, Your Honor, it hasn't made, it has not made those concessions. We're just going in circles. Yeah, I hear you. Thank you. Let me make sure my colleagues don't have additional questions for you at this time. You have a little bit of time. We'll give you a little time for rebuttal. Make sure you don't. We don't have further questions for you at this time. And we'll hear from your colleague on the same side. Miss Malia. Good morning, Your Honor. May it please the court. Emily Malia for petitioner. I'll WU. I would like to start my argument addressing the questions of successorship that were brought up earlier. And in particular, the board's finding here on successorship depends on its finding that Everport discriminated against machinists in hiring of mechanics. And that but for that discrimination there, they were. They said machinists. Yeah, the machinists. But for that discrimination, a majority of the employees hired would have been machinists. That is a necessary element of successorship under the board's case here. Now, the board, though, found that discrimination because Everport followed the longshore agreement. So there really is no way to divorce these two concepts. The successorship depends on a finding that complying with the longshore agreement, specifically the requirement to exhaust the hall before you consider any external applicants was unlawful discrimination. And for that reason, I think it is important that successorship is not just based on the fact that are not contested here, that the work remains similar or that there was these prior historic bargaining units before Everport took over. The question really depends on was it discrimination, unlawful discrimination for Everport to comply with the contract. And likewise, for my client, did my client violate the act by engaging in conduct that I think the act was enacted to protect, ensuring compliance with this collective bargaining agreement and advocating for the workers it represents. Miss Crowley, could Everport have hired longshoremen without joining the PMA? No, the only way to access the pool of longshoremen as well as meet marine clerks is to be bound by the longshore agreement. So longshoremen who are members of the ILW don't work at any of the non-PMA ports at all? Terminals are for non-PMA terminals. Yeah. So they only work at PMA terminals. Yeah. OK. Yeah. It's not the sort of contract where an employer can access the pool of workers and just say, OK, we'll comply with the economic terms. I know there are those types of contracts. This contract does not allow that. You have to be bound by all the terms of the agreement, be part of the multi-employer bargaining association in order to access those workers, access the workers. You raise an interesting point, which was a little bit perplexing to me. You're essentially saying that, you're saying directly, the discrimination occurred in following the alleged contract rules, which required them to hire the longshoremen. You're giving preference to longshoremen when you shouldn't have. Right? I believe so. But it's the longshoremen and marine clerks. So when Everport joined the Pacific Maritime Association, became bound by the agreement, the ILW demanded and Everport complied with its obligations to hire marine clerks, with its obligations to hire longshoremen. With the exception of longshore mechanics, both of those aspects were not concerned. The board seems to be, in your analysis, the board seems to be doing or saying or suggesting is that to the extent that that contract gave preference to longshoremen in areas in a unit that was always understood to be manned by or people by machinists, that was impermissibly discriminatory and it's not going to trump the successor rule. That's essentially what the board seems, in your view, seems to be doing. Right? In other words, yeah, there's the contract, but the contract's discriminatory. So we're not going to fight you on whether you had to join in that contract. The red circle still should continue, but not in this modified form, which gives preference to the longshoremen. That's what the board seems to be saying. Right? To the extent I understand the board's theory in this case, I believe it is that Everport discriminated against the machinists by applying the longshore contract. By applying the modified notion of the red circle. In other words, because previously it was clearly a recognized unit with machinists in it. Well, I mean, I wouldn't say it's a modified contract. A modified application of the red circle. The parties who bargained the contract, PMA and the LWU, both agreed that the red circle expired when MTC, the formal operator, left the Nutter Terminal. Right. That's what I mean. The modified, the red circle was no longer there. The board was saying if that results in your now hiring people in a discriminatory way so that the people who formerly worked in this same successor area are now being denied jobs or limited jobs, that's discriminatory and it's not going to avoid collision with the successor rule. That's essentially what the board seems to be saying. Right? That complying with the contract, that Everport, by complying with the contract, that is the action that leads for the but-for determination. That but-for compliance with the contract, more machinists would have been. Yeah, I mean, and this is where I disagree with your colleague on your side. I'm not saying that the board is right, but our understanding of what's going on seems to differ. The board can say that a contractual provision results in impermissible discrimination. I don't know whether they've done it aptly here, and then maybe they haven't, and it is very confusing, but it seemed to me that's what was going on here. The board was saying, yeah, whatever, you have that contract and you may have signed it, but that contract cannot allow you to impermissibly discriminate against a group that is otherwise protected by the successor rule. I think the challenge, well, first is the board had no concern with the application to the vast majority of employees that work for Everport. But the challenge here is figuring out where the, it's kind of a shifting schedule, order. The contract binds Everport. Everport's required to comply with the contract. The parties to the contract agreed that the red circle no longer applied. Everport's required to comply with it for all sorts of workers. When you say no longer applies, no longer applies with respect to what? The red circle. No longer applies as a notion, or no longer applies in this situation? In this situation, because Everport had taken over. Yeah, and that's where you have a direct collision with the successor rule. And that's where the board conceptually seems to be saying, you know, you may be part of a contract, but you can't be part of a contract that discriminates against protected workers. That seems to be what's going on. We'll hear from the board. I mean, I'm trying to make some sense out of this. You can't read a contract where you and Mr. Parrish are suggesting, well, but there's a contract provision, and acknowledge that, and it's discriminatory. And it's therefore, the board has bound itself. That's not the way it works. But I don't know whether the board has clearly said that. I don't know whether it's justified. But I'm trying to understand what you all are saying. The red circle was part of that contract. And the only place the red circle motion has been eliminated is with respect to this unit that we're talking about, that has always been represented by machines. Right? I would have seen it through the only time. But at any time, the employer that was employing the machinist ceases operation, the red circle. That's the whole point. The question is, can a union and employer under a contract make that determination? The board says, no, we're making the determination. This is a successor employer. It's not an employer, as you claim in the contract, that has disappeared. That seems to be the fight that's going on here. And to be clear, though, the board is not challenging the interpretation of the agreement that the red circle expired. No, but they're saying it's discriminatory. They're saying you're saying that the contract which expires it as to these people is discriminatory. You're agreeing with that. I don't know whether that analysis makes sense, but that seems to be what they're doing. They're saying, yeah, we understand what you're saying about the contract. You're exactly right. The problem is it's discriminatory. But I think this leads to the dilemma that Everport is bound by the contract, bound to follow the contract, including that. I don't know why that bothers the two of you. That's just not a troublesome notion. If a union or an employer claimed to be protected by a contract that's prohibited by the National Labor Relations Act, that's no defense. You can't say, but I'm just following the contract. If the board legitimately says the contract, insofar as it does this, is unlawful. That's where I'm not following your two arguments at all. I am following your argument to the extent that you're saying we don't really know what the devil the board did here and we don't understand how they justified it. But I'm not following that argument. That is, but the contract says it's okay. And so we can discriminate and avoid the successor rule. I don't follow that one. Well, I guess the 1st piece is, it's not my position that there was discrimination. And the 2nd piece is that the board has repeatedly upheld the application of these sections of the contract as being lawful. Gotcha. Okay. I just want to make sure I'm understanding. We'll hear what the board has to say. Thank you, your honor. I'm not moving a tree. I was just thinking, of course, it's your job. Noted. If I don't have additional questions for you, we will hear from the board now. Thank you. Mr. Good morning. Your honor is may please the court for the national relations board. I'd like to pick up where all this argument is going and say, we basically have on 1 side, a report that's using goats that starts with the longshore contract and its provisions. And we, the board, obviously, we start with the national relations act. And the act says that employees have a right to decide who they want to select as their collective bargaining representative or nobody at all. Okay. So, we have, in this case, a unit of machinists mechanics who have recognized the machinists as their collective bargaining representative. We now have a new employer ever report who steps in as a successor into the shoes of the predecessors. And because section 7 and 9, a. Protect the rights of employees to choose to choose their own bargaining representative ever port can't just walk in and say, because I'm a party to this other contract. I can completely ignore your choice of representative to talk about this longshore contract as if it's just some random private agreements that ever report entered into. But that's not what it is. Right? I mean, the longshore agreement is 1 that the board has ratified. It's been in existence for a long time. And, I mean, it doesn't seem like the board disputes that forever port to continue a higher and longshore than they needed to join the and they needed to have access to those workers. So, it's not as though they're trying to hide behind just a private contract that they came up with. It's a board sanctioned contract that they're operating under. Well, all all, you know, all units that have been certified by the board are board sanctions, but I would really push back against the notion that the, the West Coast unit is somehow some kind of super units that has prerogatives and privileges that other bargaining units or area wide bargaining units don't have. So, let me ask you this. So, whenever port took over operation of the terminal, the longshoremen who worked there were members of the. Is that right? Yep. So, in order to retain those workers, wouldn't ever report have to join the in order to have access to those workers. Well, getting back to the question you've asked both Mr. and the board does not dispute that in order to obtain Steve door labor on the West Coast report has to join the. Okay, so so that then is a lot. I mean, and that's the only way they can continue to operate. The terminal, presumably, that's the only way they can continue to have to leave door labor at the terminal, not not maintenance and repair workers, but Steve or labor. Yes. Right. So then how, what would you have had a report do? Practically speaking, in order to continue to run their business, what would, what would be, what would be the action that they were supposed to take without running a file of the boards various either the successorship rule or the longshore agreement? Right? Well, honestly, your honor, this, this comes down to, frankly, a business mistake by ever report. They initially thought that they could hire a contractor who would then be able to negotiate the issues between and when that contractor flaked out on them towards September. They were their backs to the wall because they didn't have a backup plan. If, if ever report had hired an ILWU contractor to do the maintenance and repair work, we would not be where we are now. Ever report could have terminated the previous, the previous contractors said, you guys are done hired. Somebody new who would come in as a new employer, not a successor to the previous ones, the new employer who would come in with its own ILWU labor obtained from the ILWU joint hiring hall. And voila, that's where we would be. But what they did is they put all their eggs in the basket of Joe Gregorio, who was already involved up to his neck in litigation in this litigation between, or I mean other litigations, but related to the same issues between ILWU and IM. And after several months of hesitating, he decided he just couldn't take on another potential dispute that would bog him down in the courts. And he said, no, at that point, I'm sorry. The alternative scenario that you've outlined, which is you replace the existing subcontractor, I guess, with a different subcontractor who's then associated with ILWU rather than what the machine is, then that doesn't implicate the successor rule because you still have machinists who have been there working and they would be replaced. The successor rule obtains your honor only if the new employer steps into the shoes of the prior employer. And that involves substantial continuity of operations, continued appropriateness of bargaining unit, and majority of employees. If you have a new contractor who's an ILWU contractor who gets their staff from the ILWU Joint Hiring Hall, he's not a successor employer. Now, if the ILWU Joint Hiring Hall can't give him quality mechanics to do his job, and he has to go back to the previous mechanics, the mechanics for the predecessors, and hire them, he can't discriminate against those mechanics and arbitrarily try to keep them under a minority so that he still has a majority ILWU bargaining unit. Do you understand what I'm saying? I guess I don't understand why the subcontractor would not be a successor, but Everport is a successor. If they're managing, I mean, maybe I'm not following. Sure. Everport is a successor in this case because it started hiring from the predecessors' employers. Now, if it had not discriminated in hiring, right, at all, and it ended up with a majority of ILWU employees from the Joint Hiring Hall and a minority of IM employees, then it would not be a successor. Why? Because its employees are no longer of the majority of the previous. And how do you think they discriminated in hiring? Oh, Your Honor, the record is full of evidence of that. They told Choi, who was running the system, actually told the employees that he was under orders to make sure that IM had only 49 percent of the resulting unit, and ILWU would be 51 percent. They actually contacted employees to schedule interviews and then rescinded those interviews and in some cases rescinded job offers because those employees were represented by IM and not ILWU. You said if they had done it legitimately, in your view, whatever that means, and ended up with the same percentage, it would have been okay and the longshoreman would have permissibly been the bargaining chip representative? Yes, the problem is that they knew going into that that it wouldn't happen because the ILWU knew that it couldn't give them the same kind of employees with the same kind of experience working on that very terminal on those very machines. And they knew, therefore, that they had to figure out a system to make sure that ILWU would end up being the majority. I mean, Choi actually told his bosses, the power and crane mechanics that ILWU are sending me are not good enough. And then he went back, and even though there were crane mechanics from the predecessors who were qualified, there was no dispute about that. But instead of hiring from them, which would have put him over the 49 percent threshold, he went back, re-interviewed the poor quality ILWU mechanics and hired them. So, yes, just to summarize the point, if ILWU, I'm sorry, if Everport had run a completely impartial hiring process and ended up with the majority ILWU unit, it would not be a successor. Go ahead, Choi. I just want to follow up to make sure I'm understanding the argument in the facts. Do you agree, the analysis is so resolved, the board's analysis, that the contractual provisions that they're following are not discriminatory? Is that contractual provision discriminatory or not? I don't think it's discriminatory. I don't think the board held it was discriminatory. Wait, wait, wait. Okay, so you don't think it is and the board didn't hold that it was discriminatory. The contractual provision says initially it was construed permissibly to Red Circle, this area that we're talking about. Later, the interpretation, you're saying now conceding, permissibly said it's not a Red Circle area anymore. So under the contract that this employer was bound by, they're supposed to hire from the Longshore. And you're saying that's not a discriminatory provision? We're saying... Wait a minute, wait a minute. Forget what they did when they came in and the nasty things that were said and all of that. Just take it at the contractual level. You're saying the contractual provision was not unlawful and the contractual provision properly changed because the employer changed. Wait a minute. I want you to understand what my premise is. The contractual provision, as the parties are construing it, changed so the Red Circle was gone. And they were obliged to hire from the Longshoreman's hiring shop. Okay? My turn? Yeah, your turn. So how do we have a problem? So we are not disputing... The parties, the PMA and the ILWU, are free to interpret their contract as they see fit. No, they're free within the bounds of the law. I'm getting you to confirm that the board is not saying that that contractual provision is unlawful, right? The board has not promised its decision on a finding that the contractual provision is unlawful, right? The contractual provision, as I'm understanding it both from preparation and listening to all of you today, says for this unit, you have to hire from the Longshoreman's. Because the Red Circle is gone. You have to hire from the Longshoreman's. That's what the contract says. And you're saying that's not impermissible. It's not impermissible for them to interpret their contract that way. But they cannot rely on their contract and use their contract as a basis to steamroll the Section 7 rights. No, no, no. You can't have it. No, please. I think I'm following up on Judge Edwards in the following way. It seems to me it would be one thing if the employer said, what I want to do, I want to get the machinists out of there. I don't like the machinists. I want the Longshoreman in. And the way I'm going to do that is I'm going to construe the contract so that it allows me to do that. So I'm biased against the machinists. I've got anti-union bias against that particular union. I want to make that work. I'm just going to come up with some argument out of the contract. And then the board, I think, would be free to say, well, you can't act on bias against a union. That's an unfair labor practice. But it seems to me that your argument today sort of conflates two different things. One is I'm bound by a contract. I'm not acting on anti-union bias against one particular union. The contract just tells me what I need to do, and I'm just following the contract. That's one interpretation. And the second is a scenario along the ones that I outlined, which is that I have anti-union bias against the machinists regardless of the contract. And I'm not understanding which one of those you're relying on. And because if you're relying on the second, then that's always a principle out there that an employer can't act on that basis as a means of evacuating one union and substituting a different one that's preferred unless there's the requisite procedures to make sure that the employees, in fact, want that to happen. But it seems to me that you're equating acting under the contract and having bias against the machinists. And they seem to me to be two different things. Well, your analysis omits one important player, and that's the ILWU. You know, Everport here is, it's not Everport interpreting the contract. It's ILWU and TMA telling Everport what the contract says according to them. So what? So what? If they're telling them and it's not impermissible, if it was impermissible, this is what I'm trying to. And you, no comment. The board is not finding that the contract provision is impermissible or unlawful. There's no such finding, right? Right. Okay. The contract provision properly construed, I don't care who's construing it or who's telling someone else to construe it that way. The contract properly construed got rid of the red circle, which means this group was no longer protected in the sense that machinists were there. This group was now subject to hiring from the loan shoulder. That's the way the contract is interpreted, right? And that's the way the employer hired. I don't know if that's unlawful. But that's where you hit up against. The rights of the employees who are already there. No, no, no. It's fine, your honor, if the employer hires from the ILWU hiring hall and doesn't intentionally screen out the others. That's where the discrimination happens. Anyone who's on the other side of that process is going to say I was screened out. And the employer's answer is, yeah, because I have to hire from the hiring hall. This is no longer a red circle under the contract that the board says is lawful. I have to go through the hiring hall. So, yeah, you're asking me, am I intentionally going to the longshoreman's hiring hall? Yeah, I am. And then the employee or prospective employee says, well, that means they're preferred over me. Yeah. And so I'm not getting it. If the board has not, it seems to me the board cannot possibly reach this decision, which I guess is what Mr. Parrish was begging me to try and understand. If the board has not said that that contract, which the board endorses, is not impermissible. And then no one is disagreeing that the red circle is gone under the contract. And then all the employer did was to hire in a manner that's consistent with the contract. How can that be unlawful? In other words, what I'm suggesting to you is the reference to the successor is bogus. I strongly disagree, Your Honor. You can, but you've got to explain how.  Well, because the way the successorship analysis works is you step into the previous employer's shoes. And you have to negotiate with the previous employer's employees. And if you have another contract telling you that you can't, well, that doesn't allow you to ignore what the national. The other contract that you're talking about is a contract that binds the employer and the board doesn't doubt it. But it doesn't bind the employees who were there. No, no, no. The successor, at least as you're now explaining, is a totally bogus analysis. Because the board agrees that, yeah, they can step in here. This is the way it works. And part of what that contract that they are bound to follow, and we don't disagree with it. It's based on history, includes this red circling notion. And we agree that the red circle disappeared now because that's what their contract says. It disappeared. It wasn't intended to be discriminatory. It just disappeared. It's a new employer. And so under that contract, they have to go to the longshoreman shop. And that's what they did. You can't then somehow say the successor ruled trumps if the board agrees that this contractual provision is of longstanding and was in play and it's lawful. Here's the difference, Your Honor. Between, I think what you're sort of alluding to is kind of the Kinder Morgan scenario here. In Kinder Morgan, you had an employer that contracted work to an employer that was connected to the electricians. The longshoreman came along and said, this is our work, this is our turf. You can't give that work to the electricians. So what did the employer do? It got rid of the contractor. Well, we don't know what happened. But basically, based on the outcome of that ruling, what the employer would have had to do is get rid of that contractor and hire a new contractor with longshoreman. In that case, there is no disruption of the collective bargaining relationship that exists between the first contractors and the electricians, the first contractors' employees and the electricians. They are still represented by the electricians. Nobody has stepped on their Section 7 right to choose who they want to bargain for them. In this case, that's not what we have. We have a situation where Everport is acquiring the work, taking it in-house, becoming a successful employer, and then telling employees, you can't be with your prior union with IM. You have to join the longshoreman. Could they lawfully sign the PMA contract? I'm sorry? Could that employer that you're talking about lawfully sign the PMA contract? Which employer? The one you're calling a successor. Was it permissible for them to sign the PMA contract? Sure. There are employers who have multiple contracts with different unions for different units. That happens all the time. Sorry. The problem here is what you must be saying at the end of the day, then, is that it's okay for Everport to sign the PMA contract. It's okay for Everport to implement the consequences of that contract vis-a-vis the longshoreman, which means that they have to hire longshoremen as the stevedores. But it's not okay to follow the part of the contract that ended the red circle exemption with respect to the employers. That's not what the board said. The board is not taking an opinion as to the interpretation of the red circle terminal. It's established that the parties to a contract can interpret their contract as they see fit. So that's why we haven't said one way or another, and the board hasn't said one way or another whether that provision discriminates or not. But the end result here is absolutely discrimination. Ken DeMorgan was not a successorship case. When the board fails to engage with that reasoning, though, it doesn't explain what the relationship is between this admittedly valid contract and the successorship analysis. I mean, isn't that ultimately the problem, is that the board nowhere engages with that conflict? Well, I would submit, Your Honor, that what Everport's problem here is with the Burns analysis, which is turning 50 years next year. And the longshore contract is even older than that, right? The Burns analysis doesn't factor when you have an employer who is a successor employer, a reputed successor, who steps into a new situation and is already a party to some other contract. The problem is, Counselor, under the Burns analysis, and you agree, part of the test is the majority of the employees are coming from the predecessor. And that's easily avoided here permissibly because the longshoreman contract has been signed and the red circle is in play. So you can't meet the Burns test. They can easily avoid the 50% and permissibly avoid the 50% hiring. So you can't meet the third part of the Burns test. No, Your Honor, the fact that the contract allows them to, says that they have to pick ILW employees, does not allow them to violate the law, which says that you can't discriminate. Which law? You're not talking about the successorship rule. You're talking about discrimination. If they want to pick, like I said, if they had wanted to go at this above the board and just let the chips fall where they may, hire ILWU, interview ILWU, interview IM, and have the chips fall where they may, and they ended up with a majority ILWU unit, we would not have a problem here. They intentionally discriminated against the predecessor's employees, and they can't use the longshoreman contract as an excuse to do so. Okay. We're going around. Gotcha. Okay. Unless my colleagues have additional questions for you, Mr. Sauter, we'll hear from Mr. Rosenfeld now. Thank you. Well, let me see if I can try to make some sense out of this since I've been involved in virtually every one of these cases for the last 30 years. Judge Rao, the fact is that Everport could have hired stevedorfs, the people who load and unload the ships and operate the equipment, off the street and gone non-union. They didn't have to sign the PMA agreement. But I will concede as a practical matter that they had to sign the agreement and hire longshore employees, because otherwise they would have massive pickets not more than five miles from my house. And there are no other longshore, that is, workers who unload ships who have that training. So, as a practical matter, as to the workers who load and unload the ships, they signed with the PMA and obligated themselves to hire longshore. But at that point, it was perfectly clear from the get-go that Everport, ETS, would be a perfectly clear successor to the former operator, STF, who hired the same group of longshoremen. So, Everport becomes what we call a perfectly clear successor, and that's all discussed in the judge's decision at length. She's got 30 pages, 25 pages of analysis of these issues beginning roughly at page 371 or 372 of the joint appendix. That's also true of the watchmen. It's also true of the walking bosses who are other units that the ILWU represents. Perfectly clear, they're going to hire a majority of those people. They won't go out and advertise for people off the street or look for other unions. But if they tried to operate non-union and hired enough longshoremen to load and unload the ships, the teachers could have come in and organized those workers and representatives. That's just not practical. It's a different story as to the mechanics, because as Judge Edwards points out, if the ILWU had enough mechanics who were available in the Port of Oakland to work at this facility, they could have simply said, send us all your mechanics, we'll hire them, no problem. And they would have been what we call a perfectly clear successor or successor. There would have been no discrimination because they were a successor and they hired people from that source. The problem in this case was that the airport recognized this problem and they thought the solution was to hire Joe Gregorio and his companies to do the maintenance work. Gregorio has a company that works up and down the coast, from Seattle to Los Angeles, has several hundred mechanics. That's his business. He could have supplied 25 mechanics easily to work in this facility, move them up from LA or from Seattle and move them here and work. And had he done that, there would have been no issue of successorship because he would have been a subcontractor. Gregorio talked to them and finally, late in October, said, I can't do this, I'm out of here. And SCS then didn't go look for another subcontractor who could perform the work, simply said, okay, we'll take it in-house. And then when they began the hiring process, they didn't discriminate. Jay, when you say the consequence of he would have been a subcontractor, the red circle rule would not have come into play. Is that what you're saying? The changed red circle rule, the red circle would have remained. Is that what you're suggesting? I'm trying to understand as a practical matter. In other words, if he was a sub, it's the same employer, but I'm not sure what you're saying. Because I'm not sure what you're doing with the contract. Are you saying they couldn't sign the PMA? There was some problem there? No, they could sign it. Okay, so keep that in play. I'm listening to you, but you can't take that out of play. They signed the PMA. The PMA says something about changed employer on whether the red circle is in play or not. And that affects where they have to look for employees, as I understand it. They thought that the red circle agreement was in play until the PMA, their association, told them, sorry, it doesn't look like it's in play. And so you're going to have to find another solution. And that created the problem here because they didn't learn this until September, but they were still relying on hiring the subcontractor. Okay, I'm not being unsympathetic and not understanding the practical problems and trying to deal with this. Was that impermissible? That is, the PM's in play. Was that unlawful? Is that what the board said? They signed the PMA, and the PMA clearly gives preference to the longshoreman hiring law. The signing of the agreement was not unlawful. It was the application of the agreement, in this case, because Everport never became a successor to the subcontractors who were IAM represented because they couldn't find enough longshore mechanics. Again, had the same situation existed for the group of mechanics? Everport never became a successor. Everport never became a successor legitimately and with respect to the IW. They became a successor with respect to the IAM because the historic bargaining unit survived and they discriminated in hiring. Do you think that they were right or wrong to be persuaded the way you understand the facts? And I'm not disputing that at this point. They initially thought that the red circle exception, they being Everport, initially thought that the red circle exception would continue to apply. And the way you're describing it, they were then persuaded by others that it didn't apply anymore. Was that right? Or was that wrong? Well, that's the right description of what happened. But as the judge points out, and the board adopted the findings at page 386 of the record, the red herring issue is really a red herring. The red circle language is really a red herring. It's sort of irrelevant to this whole thing. Because what Everport did was, again, had they hired 27 mechanics in the IW, no question, it never would have been an issue because they would have been a perfectly clear successor, meaning from the get-go, meaning September or August of 2015, it was clear they were going to have a complete workforce or majority workforce of IW members. The problem was they weren't what we call a perfectly clear successor. They couldn't make a decision which union would apply until they knew who the workforce was. If the workforce was all hired off the street, all non-union, they couldn't have applied the agreement until after those workers were hired. If it doesn't matter to you whether – if the red circle is a red herring, as you put it, or as it's been put, and it doesn't matter to you at all whether the red circle exception continues to apply, then that just means it doesn't matter to you at all what the contract requires. Right. Right? That's right. In this case, it doesn't matter and can't be applied, although they could sign the agreement in the spring of 2015 and apply it to the longshore workers who load and unload the ships because they always intended to and everyone knew that they would hire from their predecessor, SDS. They would hire all their employees. They didn't discriminate. They kept the same longshore workers who were coming in and when the ship showed up, they unload the ships, they load them, they go away, they come back a few days later. It was the same group of longshore. Perfectly clear successor, no issue, no discrimination. But as to the mechanics, it was the reverse situation where they thought they had a plan, the plan fell apart, and then the only way that they could preserve their successorship with the ILWU was to discriminate against the IM mechanics because the ILWU didn't have enough. I mean, I understand the worldview that says that even if Everport thinks that the contract requires them to preference ILWU workers over machinists, it doesn't matter what the contract says. The law, meaning the NLRA, just doesn't allow that. You have to act as if the Red Circle exception just continues. The law just requires that. It's not that the contract in fact, I understand that worldview as a conceptual matter. I guess it just, as the long argument this morning indicates, there's a lot of thought that goes into that and to understand how all these things interrelate. And I'm just not seeing that in the board's, in the ALJ's opinion that was ratified by the board. The engagement on, at that level that leads me to understand why it doesn't matter what the contract says and that the law, the way you're looking at it, which is that the NLRA just says, I don't care what the contract says, you still have to continue as if the Red Circle exception is in effect. That seems like a pretty significant conclusion as to which there's just an assumption that that has to be right. I do not agree that they had to operate as if the Red Circle language was in effect. PMA said the Red Circle language didn't apply. From the machinists' point of view, we thought it did, but it made no difference because Everport had the right and the need to hire people directly. They couldn't subcontract it, which was their solution. I think Mr. Schauder is right that had PMMC, PCMC, Joe Gregorio taken the work, he would have had a total crew, would have been able to do the work, and there were other other subcontractors who could have done the work. They just, in November, as Everport didn't go out and try to find another subcontractor to do the work, they made the business decision to hire directly. They had already made the decision to hire directly the longshore workers, the loaders and unloaders. Now they made the decision to hire directly the mechanics. They didn't, in November, know whether the crew that they hired, the 27, would be off the street, non-union. They didn't know whether they'd be IWU. They didn't know whether they'd be machinists because they didn't know how the hiring would happen. So they patched a plan in order to assure their right to continue representation of IWU to discriminate against anybody who applied. They would hire 51% IWU and 49% machinists. That was an unlawful scheme. That's what the record is chock full of. What they had to do at that point was say, we don't know. This is what a successor always does. They say, we don't know who we're going to hire. We're going to operate the same business. We're going to advertise for workers. We're going to interview the former workers. And if the former workers become a majority, we will recognize the union. That's what Byrne said. So they can hire from any source. It depends on whether they hire a majority. In this case, they didn't hire a majority of the mechanics who were all qualified, all 27 of them, machinists, because they hired unqualified longshoremen and specifically said, we're going to discriminate and hire only 51%. And they lost the point under Love's barbecue to say, we are a legitimate successor. Love says, you can't claim successorship status if the majority status depends upon discrimination. And normally the way it works is the successor employer says, okay, I'll hire and only hires 40% of the union workers and then 60% non-union and says, hey, we're free. We're non-union. We didn't hire a majority. Here it's the reverse. Okay. You say, I don't, I'm not sure. One last question. I'm not following. Are you saying they were or were not a successor? I'm saying they were a successor under Byrne's because for two reasons. Wait, they were a successor what? I'm having trouble hearing you. There are two tests of successorship under Byrne's. Continuity of the work and of the organization. Right. Number two, you have to hire a majority. I understand. What's your conclusion? Were they a successor or not? They are a successor as to the machinists. They are not a successor as to the LWU. Because they are not a successor because when the hiring was done, they discriminated against the machinists and had they hired a majority of machinists, they would clearly have been a successor as to the machinists. What percentage, as best you know, in the pre-existing unit that was shut down and then reopened, was longshoremen as opposed to machinists? What percentage were machinists? They weren't all machinists, right? Let's go back. There are two different groups here. In the very beginning, when this first started, this area, what percentage of the employees approximately were machinists, handling the work that was there to be done as opposed to longshoremen? Was there another terminal or another one? The very beginning, when this all started. When this all started, up until December 5, all the workers performing the maintenance work were members of the machinists. In December 5, they were terminated. Were there any longshoremen working in this area? Yes, there were some longshoremen working on December 5 and thereafter doing longshore work. Not as maintenance workers, though. The maintenance workers were all machinists. The maintenance workers were always machinists, right? Always machinists, until December 5, when they were all terminated. Then it changed because Everport began hiring to staff up a crew. They started hiring a few people here and there because they had to continue to do maintenance. They hired people and then employed them to December. When ships started coming in, they, of course, hired much bigger crews of workers, the longshore workers, to load and unload the ships. At that point, they hired up to 27 workers, it's all on the record. They discriminated against the machinists and favored the LWU. They lost the right under laws to claim successorship as to the LWU. I think we have that aspect of your argument. I want to make sure there's not any other questions that we have for you at this time, Mr. Rosenfeld. Let me just take off on one other point here. If you could do it efficiently, I would appreciate it. I think that the board's point here is that the successorship doctrine, in this context, trumps or supersedes the union's agreement. I agree with the LWU agreement that says we get to perform all the maintenance work. They don't in this facility, they don't in other facilities in Oakland, they don't in other facilities in Tacoma, in Seattle, because the machinists represent workers for other contractors, and even for some other contractors for parties to the same agreement. That's the point. Thank you. I appreciate that. Thank you, Mr. Rosenfeld. Mr. Parrish, we'll give you three minutes for rebuttal. Thank you, your honors. The entire case that has been framed, both by the relief that the board has ordered and in the charge that was filed, you can see this on JA 401, was that we engaged in discriminatory practices because we did not bargain with the machinists. That's the whole case. The discrimination flows from the fact that we are complying with the Longshore contract. I will just highlight what we've learned from this argument, because it clarified what I was trying to articulate, but I think your questions have pulled this out. Judge Edwards, as you heard, he is not saying at the board that the contract itself is discriminatory. In fact, we know that the board has consistently said the provisions are fine. We've also heard this morning that no one disputes that the red circle is gone because of the way that Everport relates to the existing machinists. We were told that. You heard the board's lawyers say we were told that. Everport was told that. We must comply with that by both PMA and by the Longshoremen Union, and they are not disputing that interpretation of the contract. Judge Rao, you asked me earlier, and you've asked several times, did we have to join the PMA? The answer is yes. Then the next question is, was there anything unlawful about joining the PMA? The answer is no. Are the provisions fine? Yes, and the Ninth Circuit has held that the Longshore contract specifically covers repair and maintenance work. All of that together means that this is not us engaging in a discriminatory practice. It's us complying with the system that has been set up by the board. Judge Srinivasan, you asked about the question of bias, and you put your finger exactly on it. There is no bias here. There is an allegation of bias. What there is an allegation of is an employer that is trying to do its best to comply with the Byzantine rules that the board has set up and now wants to change. But the rules are that as long as we are okay to join the PMA, as long as the Longshore contract is controlling, then everything else flows from that. And this attempt to try to say there's additional discrimination doesn't work. In fact, if you take a look at the Longshore amicus brief, if anything, the allegations work in their favor, not in favor of the machinists. So, Your Honor, I agree with, and I'll just finish here, Judge Srinivasan, you are correct that at a minimum the court needs to send this back because no one can make head or tails of what the board has done. But, Your Honor, if you listen to concessions that have been made this morning and the concessions that have been made in the brief, there's only one result, which is that if they want to change the rules, they can do it prospectively. They can't do it retroactively on the idea that we've violated the law. Unless you have any questions, I want to thank the court for its time. We appreciate it. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Rao, Edwards